1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11   OPTHALMIC IMAGING SYSTEMS,
     a California corporation,
12                                        NO. CIV. S-04-482 LKK/DAD

13            Plaintiff,

14      v.                                    O R D E R

15   MARK FUKUHARA, an individual;
     DOUGLAS BURLAND, an individual;
16   MICHAEL GERKOVICH, an individual;
     STEVEN LEACH, an individual;
17   EDMUND PETERSON, an individual;
     DAN SALOMON, an individual; JOE
18   SILVA, an individual; DALE BRODSKY,
     an individual; EYEPICTURES, INC., a
19   Missouri corporation; JUSTICE
     OPTHALMICS, INC., a Tennessee
20   corporation; ZETA DEVELOPMENT LABS,
     INC., a Tennessee corporation; and
21   JOHNNY JUSTICE, JR., an individual,

22            Defendants.
     _____/

23

24   _____Pending before the court are Eyepictures, Inc.'s

25   ("Eyepictures") and Dale Brodsky's ("Brodsky") motions for

26   ////

1

1 summary adjudication.[1]  On December 9, 2004, this court denied

2 defendant Michael Gerkovich's motion to dismiss for lack of

3 personal jurisdiction and granted defendants Johnny Justice,

4 Jr.'s and Justice Opthalmics, Inc.'s motion to dismiss for lack

5 of personal jurisdiction.  On March 2, 2005, this court denied

6 in part, and granted in part, defendants' motions to dismiss the

7 Lanham Act claims pursuant to Fed. R. Civ. P. 12(b)(6).[2]

8 **I.**

9 **BACKGROUND[3]**

10    Opthalmic Imaging Systems, Inc. ("OIS"), a corporation with

11 its principal headquarters and place of business in Sacramento,

12 California.  It manufactures digital ophthalmic imaging systems

13 which integrate "fundus cameras" – specially designed cameras

14 used to photograph the human eye.  OIS also develops its own

15 proprietary software for use with its products.  OIS submits

16 that it was the first company in the world in this market.  OIS

17 provides servicing to its customers by entering into a variety

18 of service plan contracts.  Most of its customers are

19

20    [1]  Defendant Brodsky moves for summary adjudication as to

21 causes of action one (copyright infringement), two (Lanham Act violations), five (misappropriation of trade secrets), and six (interference with contract).  Defendant Eyepictures moves for

22 summary adjudication as to causes of action one (copyright infringement) and two (Lanham Act violations).

23

24    [2]  The motion was brought by defendants Fukuhara, Burland, Gerkovich, Leach, Peterson, Salomon, Silva, Justice, Justice

25 Opthalmics, Inc. and Zeta Development Labs, Inc.

26    [3]  Background facts are derived from plaintiffs' first amended complaint.

2

ophthalmology practices located throughout the United States.

OIS asserts that a crucial source of its value and profitability lies in its trade secrets, which consist primarily of customer lists, manufacturing and design know how, vendor information, and servicing "know how."  In order to preserve the confidentiality of its trade secrets, OIS requires all employees to sign confidentiality agreements which prohibit OIS employees from disclosing OIS' trade secrets during and after their employment.

In January 2002, defendant Mark Fukuhara, then the Vice President of Operations of OIS, was terminated by the company. Over the next year, other OIS employees, including Michael Gerkovich, left the company to join Fukuhara in a new business. According to OIS, by late spring of 2002, it learned from several of its customers that these former employees ("defendant employees") had formed a new business called Imaging Service Group, and that, at least in part, their business was providing service for customers of OIS' imaging systems.  The business was owned principally by defendants Dale Brodsky, Gerkovich, and another shareholder.  OIS claims that Gerkovich solicited the business of OIS customers who were seeking service for their OIS imaging systems, and directed these customers to defendant's new business enterprise located in El Dorado Hills, California.

In the spring of 2003, OIS became aware that some part of defendant employees' business had been acquired by entities under the control of defendant Johnny Justice, Jr. ("Justice"),

1  a resident of the state of Tennessee and one of the most

2  prominent ophthalmic imaging specialists in the United States.

3  Justice is 100% shareholder of defendant Zeta Development Labs,

4  Inc. ("Zeta"), a Tennessee Corporation.  Zeta also does business

5  under the Justice Diagnostic Imaging, Inc. name.  OIS alleges

6  that Justice, and another company he owns, Justice Ophthalmics,

7  Inc. (JOI), were placed on notice of OIS' concern that the

8  defendant employees were misappropriating OIS' trade secrets and

9  confidential information in 2003.

10      Late in 2003, OIS gathered evidence showing that the

11 defendants had misappropriated OIS' trade secrets and were using

12 them to divert OIS' customers and business to themselves.  OIS

13 alleges that defendant Fukuhara, while working for defendants

14 Zeta and/or Eyepictures, "authorized the unauthorized loading of

15 OIS Winstation software into an imaging system sold to

16 Zeta/Eyepictures [sic] customer."  Plaintiff alleges that

17 defendant Brodsky, along with others, are liable for

18 contributory infringement of OIS' copyrighted works.  Plaintiff

19 also maintains that Brodsky and Eyepictures, along with others,

20 are vicariously liable for the direct infringement of OIS

21 copyrighted works.

22      Plaintiff explains that defendants have used false

23 statements about their business for the purpose of confusing

24 customers about the source and origin of the defendants'

25 products and services and disparaging the relative quality of

26 OIS' products and services.  Plaintiff also charges Brodsky and

1  Eyepictures of misappropriating trade secrets, including copying

2  OIS' customer database and information and using it to solicit

3  and contact OIS customers.

4      Finally, plaintiff asserts that each of the employee

5  defendants who have left OIS signed an employment agreement

6  promising to maintain confidentiality of OIS' trade secrets and

7  confidential information.  Brodsky and Eyepictures allegedly

8  were aware of such agreements and upon information and belief,

9  these defendants induced the employees to breach their contracts

10  with defendants.

11                              **II.**

12                            **FACTS[4]**

13  **A.  OIS' AND EYEPICTURES' IMAGING SYSTEMS**

14      Steven Verdoneer, president of OIS, has "done an initial

15  inspection of defendants' imaging systems" this past year.

16  Verdoneer Dep. at 59: 20.  He "examined the cables," "the back

17  of the computer," "the video adapter and . . . their hard drive

18  directories."  Id. at 61:17-19.  Based on such examination,

19  Verdoneer concluded that "it appear[ed] their [defendants']

20  software is different than the OIS software."[5]  Def.'s SUF 1.

21      It is undisputed that OIS receives a one-time payment for

22  the license of its software with the sale of its imaging system.

23  Def.'s SUF 2.  A purchaser of plaintiff's retinal imaging system

24  _____

25      [4]  Unless otherwise noted, all facts are undisputed.

26      [5]  Verdoneer examined a system of a Florida-based customer who
   had used defendants' system that was "taken in on trade."

1  is entitled to use the software for an indefinite period of

2  time.  Def.'s SUF 3.  Plaintiff charges sales tax on the price

3  of the system as a whole, which includes the software.  Def.'s

4  SUF 4.  The only occasions when plaintiff has asked for a return

5  of software is when the digital imaging system is being returned

6  to plaintiff.  Def.'s SUF 5.  Defendants do not dispute that

7  they have copied plaintiff's software in connection with the re-

8  loading of the software from one OIS system already owned by a

9  customer to another OIS system owned by the same customer.

10 Def.'s SUF 5.

11 **B.   DALE BRODSKY AND EYEPICTURES**

12      Dale Brodsky asserts that he "had no involvement in

13 development of a website for Imaging Services Group or any

14 knowledge that any of its contents were unfair or misleading."

15 Brodsky Decl. at 3:1-3.  Brodsky owned St. Louis Opthalmics

16 Equipment, Co., a Missouri-based corporation, and the idea of

17 starting Eyepictures in 2000 was his.  Brodsky Dep. at 15:7-24;

18 23:8-22.  At the time of Eyepictures' incorporation, the

19 shareholders of Eyepictures were Brodsky and Mike Gerkovich.

20 Id. at 27:10-28.  Initially, Eyepictures was funded entirely by

21 Brodsky, and he also provided equipment and inventory from St.

22 Louis Opthalmics.  He also provided several cameras, including a

23 camera back prototype from Edmund Scientific.  Id. at 36:14-

24 37:21.  Until 2002, Brodsky provided approximately $120,000 for

25 the financing of Eyepictures.  Id. at 99:24-103:16.  After 2002,

26 he contributed approximately $300,000, mostly in the form of a

1   loan.  He borrowed a line of credit from Missouri State Bank

2   totaling approximately $200,000, and the rest came from his

3   earnings at St. Louis Opthalmic.  _Id_.

4        Brodsky served as the officer, president, and secretary of

5   Eyepictures' Board of Directors.  Decl. at 41:22-22:8.  Brodsky

6   also signed the lease for Eyepictures' El Dorado Hills office.

7   _Id_. at 54:14-55:3.  Brodsky contends that he was not aware that

8   any of Eyepictures' employees had signed confidentiality

9   agreements with OIS, but he has been told otherwise during the

10  course of this litigation.  _Id_. at 68:8-25.  Mark Fukuhara, Doug

11  Burland, and Mike Gerkovich all worked for Eyepictures.  _Id_. at

12  80:4-19. Prior to 2002, Brodsky was aware that Gerkovich was

13  affiliated with OIS.  Brodsky retained Mark Fukuhara as an

14  independent contractor after Mr. Fukuhara's employment with OIS

15  had been terminated.  Def.'s SUF 12.  However, Brodsky asserts

16  that he was not directly involved with the hiring of other

17  Eyepictures employees.  Def.'s SUF 13.  In 2003, Brodsky finally

18  sold the assets of Eyepictures to Johnny Justice for a

19  significant sum.  Davis Decl. 2, Ex. C (copy of purchase

20  agreement).

21       On approximately December 26, 2002, Brodsky received a

22  letter from OIS' then attorney, Kimberly Mueller.  _Id_. at

23  143:14-25.  The letter was addressed to Dale Brodsky at St.

24  Louis Opthalmic Equipment Company, in which Mueller, counsel for

25  plaintiff, requested "assistance in evaluating information

26  suggesting that [Brodsky's] company (including its affiliated

1  entities), with its employees and contractors, was

2  misappropriating confidential and proprietary information" owned

3  by Medivision and OIS.   Id.

4      Brodsky asserts that he stated during a conference call

5  that he "didn't want anything to do with anybody else's

6  information."  Brodsky Decl. at 95:15-96.  Brodsky also

7  maintains that he was not involved in the solicitation of

8  customers for Eyepictures, Inc. dba Imaging Services Group.

9  Def.'s SUF 9.  Solicitation letters, however, were sent by

10 employees of Eyepictures, Inc., dba Imaging Services Group which

11 "outline[ed] available service options provided by ISG."  The

12 letters noted that "for the next 60 days ISG is offering a

13 specially priced block of 10 hours of telephone support . . . ."

14 Def.'s Ex. F.  Dale Brodsky maintains that "he never had any

15 personal knowledge that anyone affiliated with Eyepictures

16 improperly misappropriated any trade secret information

17 belonging to plaintiff."  Def.'s SUF 11.

18     The website for Eyepictures contains several statements,

19 including that Eyepictures employs "best in industry technicians

20 who can offer a higher level of service than users of digital

21 systems have been experiencing," and that "our pricing for

22 service, repair or training is 25 to 30 percent less than the

23 manufacturers [sic] prices . . . [r]eplacement parts are up to

24 40 percent less than the manufacturer charges for the same item

25 in some instances!"  Def.'s Ex. E.

26 ////

1                              **III.**

2        **SUMMARY JUDGMENT STANDARDS UNDER FED. R. CIV. P. 56**

3        Summary judgment is appropriate when it is demonstrated

4   that there exists no genuine issue as to any material fact, and

5   that the moving party is entitled to judgment as a matter of

6   law.  Fed. R. Civ. P. 56(c); See also Adickes v. S.H. Kress &

7   Co., 398 U.S. 144, 157 (1970); Secor Limited v. Cetus Corp., 51

8   F.3d 848, 853 (9th Cir. 1995).

9        Under summary judgment practice, the moving party

10                [A]lways bears the initial responsibility of
                  informing the district court of the basis
11                for its motion, and identifying those
                  portions of "the pleadings, depositions,
12                answers to interrogatories, and admissions
                  on file, together with the affidavits, if
13                any," which it believes demonstrate the
                  absence of a genuine issue of material fact.
14

15   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here

16   the nonmoving party will bear the burden of proof at trial on a

17   dispositive issue, a summary judgment motion may properly be

18   made in reliance solely on the 'pleadings, depositions, answers

19   to interrogatories, and admissions on file.'"  Id.  Indeed,

20   summary judgment should be entered, after adequate time for

21   discovery and upon motion, against a party who fails to make a

22   showing sufficient to establish the existence of an element

23   essential to that party's case, and on which that party will

24   bear the burden of proof at trial.  See id. at 322.  "[A]

25   complete failure of proof concerning an essential element of the

26   nonmoving party's case necessarily renders all other facts

                                  9

1  immaterial."  Id.  In such a circumstance, summary judgment

2  should be granted, "so long as whatever is before the district

3  court demonstrates that the standard for entry of summary

4  judgment, as set forth in Rule 56(c), is satisfied."  Id. at

5  323.

6       If the moving party meets its initial responsibility, the

7  burden then shifts to the opposing party to establish that a

8  genuine issue as to any material fact actually does exist.

9  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

10  586 (1986); See also First Nat'l Bank of Ariz. v. Cities Serv.

11  Co., 391 U.S. 253, 288-89 (1968); Secor Limited, 51 F.3d at 853.

12       In attempting to establish the existence of this factual

13  dispute, the opposing party may not rely upon the denials of its

14  pleadings, but is required to tender evidence of specific facts

15  in the form of affidavits, and/or admissible discovery material,

16  in support of its contention that the dispute exists.  Fed. R.

17  Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; See also First

18  Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954

19  (9th Cir. 1998).  The opposing party must demonstrate that the

20  fact in contention is material, i.e., a fact that might affect

21  the outcome of the suit under the governing law, Anderson v.

22  Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local

23  No. 169, Assoc. of Western Pulp and Paper Workers, 971 F.2d 347,

24  355 (9th Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific

25  Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and

26  that the dispute is genuine, i.e., the evidence is such that a

reasonable jury could return a verdict for the nonmoving party, Anderson, 477 U.S. 248-49; see also Cline v. Industrial Maintenance Engineering & Contracting Co., 200 F.3d 1223, 1228 (9th Cir. 1999).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 290; See also T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); see also International Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); See also In re Citric Acid Litigation, 191 F.3d 1090, 1093 (9th Cir. 1999). The evidence of the opposing party is to be believed, see Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587 (citing United States v.

11

<u>Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (<u>per</u> <u>curiam</u>)); <u>See also</u> <u>Headwaters Forest Defense v. County of Humboldt</u>, 211 F.3d 1121, 1132 (9th Cir. 2000).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  <u>See</u> <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

**IV.**

**ANALYSIS**

Defendant Eyepictures moves for summary judgment on plaintiff's first and second causes of action (copyright infringement and Lanham Act violations, respectively). Defendant Brodsky moves for summary judgment on these two causes of action as well as on plaintiff's fifth and sixth causes of action (misappropriation of trade secrets and interference with contract, respectively).  As explained further below, the court must deny the motions as to each cause of action.

////

////

**A.   FIRST CAUSE OF ACTION: COPYRIGHT INFRINGEMENT (BRODSKY AND EYEPICTURES)**

Plaintiffs must satisfy two requirements to present a prima facie case of copyright infringement: (1) they must show ownership of the allegedly infringed material and (2) they must demonstrate that the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106.[6]  <u>A&M Records, Inc. v. Napster, Inc.</u>, 239 F.3d 1004, 1013 (9th Cir. 2001).

////

---

[6]  Section 106 states:

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

1    Plaintiff brings a copyright infringement claim against

2  defendants because they allege that defendants assisted OIS

3  customers by copying OIS software from one computer to another

4  owned by the customer. Def.'s SUF 5.  Put differently,

5  defendants helped OIS customers "load existing software - their

6  existing review station software on another computer."  Fukuhara

7  Dep. at 161: 20-23.  According to Fukuhara, defendants "imaged a

8  hard drive [containing OIS software] onto another computer and

9  sent the hard drive and computer back" to the customer.  Id. at

10 162:3-6.  See also Burland Dep. at 132:22-133: 16 ([Eyepictures]

11 made a copy of software one time to load for a client's

12 system.).  Plaintiff contends that this copying, without OIS'

13 authorization, is copyright infringement.  Defendants contend

14 that their actions are protected under the First Sale Doctrine,

15 codified at 17 U.S.C § 109(a).[7]  I cannot agree.

16    **a.  First Sale Doctrine**

17    "The first sale doctrine provides that where a copyright

18 owner parts with title to a particular copy of that copyright

19 work, he divests himself of his exclusive right to vend that

20 particular copy."  United States v. Wise, 550 F.2d 1180 (9th

21 Cir. 1977).  In Mirage Editions, Inc. v. Albuquerque A.R.T. Co.,

22

23    [7]  17 U.S.C. § 109 states in pertinent part:

24    (a) Notwithstanding the provisions of section 106(3),
     the owner of a particular copy or phonorecord lawfully
     made under this title, or any person authorized by such
25   owner, is entitled, without the authority of the
     copyright owner, to sell or otherwise dispose of the
26   possession of that copy or phonorecord.

1  856 F.2d 1341, 1344 (9th Cir. 1988), copyright owners brought

2  suit against a tile seller who transferred artworks from a

3  commemorative book to individual ceramic tiles for sale to

4  public.  The court held that such action constituted "derivative

5  works" and infringed the copyrights of the book.  The Ninth

6  Circuit explained that under the first sale doctrine, appellant

7  can "purchase a copy of the Nagel book and subsequently alienate

8  its ownership in that book . . ." but that "the right to

9  transfer applies only to the particular copy of the book which

10 appellant has purchased and nothing else." Id. at 1344.  In

11 sum, the first sale doctrine vests the copy owner with statutory

12 privileges under the Act which operate as limits on the

13 exclusive rights of the copyright owners as to that particular

14 copy.

15      The instant case does not involve a sale of software.

16 Instead, defendants, with the customer's consent, allegedly

17 copied OIS' software for a customer from one computer to another

18 computer for that same customer's use.  Defendants maintain that

19 the right to transfer or sell lies with OIS' former customer

20 because it applies to that same copy of software, and thus, the

21 first sale doctrine applies.  That argument is unavailing.  The

22 first sale doctrine allows for the transfer of just one copy of

23 a copyrighted work.  Based on the record, it is unclear whether

24 only one copy of the software existed after defendants copied

25 OIS' software from one computer to another, or whether, as a

26 result of defendants' conduct, there are now two copies of the

software.[8]  Because the first sale doctrine provides an owner

with the exclusive right to only <u>one</u> copy of a copyrighted work,

and because the court cannot determine that defendants had in

possession only one copy of the software after it was copied,

defendants have failed to demonstrate that the first sale

doctrine protects them from a trademark infringement claim.

Defendants' motion for summary adjudication as to trademark

infringement must be denied.

**B.   SECOND CAUSE OF ACTION: LANHAM ACT VIOLATIONS[9] (BRODSKY AND EYEPICTURES)**

Defendants contend that solicitation letters sent out by

Douglas Burland in 2002 and that statements made on Eyepictures'

website do not constitute Lanham Act Violations.  As plaintiff

correctly notes, following the court's order on defendants'

motion to dismiss filed on March 2, 2005, there remained two

_____

[8]  Conceivably, defendants may have destroyed the original copy after the copying was completed.  The court attempted to clarify with defendants' counsel during oral argument whether the original copy of the software was destroyed after being copied to a second computer, but counsel stated that he was not certain.

[9]  To state a prima facie claim under the Lanham Act § 43(a) for false advertising, the plaintiff must show that: (1) defendant made a false statement of fact in an advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.  <u>Southland Sod Farms v. Stover Seed Co.</u>, 108 F.3d 1134, 1139 (9th Cir. 1997) (citing <u>Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Serv., Inc.</u>, 911 F.2d 242, 244 (9th Cir.1990)).

1 false advertising claims for which defendants Eyepictures and

2 Brodsky could be held liable: (1) that solicitation letters sent

3 by Doug Burland failed to identify that Burland was not

4 identified with OIS,[10] and (2) that the defendants' statements

5 regarding their prices for service could fall into the ambit of

6 false advertising.[11]

7     As plaintiff accurately explains, defendants have not

8 introduced any evidence concerning the truth or falsity of these

9 statements, or resolve their ambiguity.[12]   Rather, as plaintiff

10 points out, the defendants merely reargue that the statements

11 are not actionable as a matter of law.   See Repl. Br. ("[T]he

12 defendants maintain that they [false advertising claims] are not

13 actionable as a matter of law.").   The court has previously held

14 these causes of action are cognizable.

15

16     [10]  Specifically, plaintiff alleges that the defendants made
and used "false and deceptive statements about their own business
and the business of OIS . . for the purpose of confusing customers

17 about the source and origin of the defendants' products and
services and disparaging the relative quality of OIS's products and

18 services." Compl. at 25-26. According to plaintiff, the letter was
deceptive because defendants failed to state that Burland was not

19 affiliated with OIS. Compl. at ¶86(a).

20     [11]  Plaintiff brought suit to challenge representations found
in a website concerning defendants' expertise.  Those statements

21 include that (1) defendants provided "'Best in Industry'
technicians who can offer a higher level of service than users of

22 digital systems have been experiencing," (2) defendants could
provide "[s]ignificantly reduced support and repair costs," and

23 that (3) pricing for "service, repair, or training" would be 25 to
30 percent less, impliedly, than OIS.

24

25     [12]  Defendants, without citing to any evidence, argue that
customers would not have thought that Doug Burland was sending the

26 solicitation letter on behalf of OIS when he was, in fact, already
working for Eyepictures.

1    Regarding the solicitation letters, the court found that

2  defendants' solicitous statements contained in the letter sent

3  by Burland make ambiguous suggestions which are actionable under

4  the Lanham Act.  Order at 8. Regarding the website statements,

5  the court held that the statement regarding "service, repair, or

6  training" for "25 to 30 percent less" is measurable and specific

7  enough to be actionable under the law.  In short, the previous

8  March 2, 2005 order is the law of the case, "and this court, as

9  well as the litigants, are bound thereby." See Rio Grande

10  Western Ry. Co. v. Stringham, 239 U.S. 44 (1915).  Defendants'

11  motion as to this cause of action must be denied.

12  **C.    FIFTH CAUSE OF ACTION: MISAPPROPRIATION OF TRADE SECRETS**
    **(BRODSKY)**

13

14    Defendants bring their fifth cause of action for trade

15  secret misappropriation.  A prima facie claim for

16  misappropriation of trade secrets requires the plaintiff to

17  demonstrate: (1) the plaintiff owned a trade secret, (2) the

18  defendant acquired, disclosed, or used the plaintiff's trade

19  secret through improper means, and (3) the defendant's actions

20  damaged the plaintiff.  See Cal. Civ. Code § 3426.1.  In their

21  complaint, plaintiffs allege that defendants misappropriated

22  trade secrets by making unauthorized copies of OIS information,

23  testing and manufacturing OIS' imaging systems, using

24  confidential information relating to servicing of OIS systems by

25  former OIS technicians and soliciting OIS customers using such

26  confidential and proprietary information.  Compl. at 33-34.

1  Plaintiffs assert that defendants "with knowledge of the scheme

2  and plan of the defendants' business enterprise . . . conspired

3  together and rendered assistance to the defendants' conspiracy."

4  In addition, Brodsky allegedly was one of the defendants who

5  initiated the conspiracy in or about 2002, and also "aided and

6  abetted the enterprise of the defendants [sic] scheme . . . ."

7  Id. at 34-35.

8       Defendant Brodsky argues that the court should grant

9  summary judgment as to this claim because he did not conspire

10 with the other defendants to misappropriate any trade secrets

11 because he had no knowledge of any misappropriation.   The

12 contention cannot support a motion for summary judgment.

13      Under California law, knowledge and intent "may be inferred

14 from the nature of the acts done, the relation of the parties,

15 the interest of the alleged conspirators, and other

16 circumstances."  See Wyatt v. Union Mortgage Co., 24 Cal.3d 773

17 (1979).  Defendant argues that he had no knowledge of any

18 misappropriation, relying primarily on the fact that he

19 established a policy that the defendants would not

20 misappropriate any of the plaintiff's trade secret information.

21 Defendants' evidence is hardly dispositive of the issue.

22 Rather, plaintiff tenders sufficient evidence to raise a dispute

23 as to knowledge.

24      Specifically, plaintiff submits evidence that Brodsky is

25 the shareholder, chief director, and chief officer of

26 Eyepictures and that he hired Gerkovich and Fukuhara, who hired

1    the other employees who formerly were affiliated with plaintiff.

2    Brodsky Decl. at ¶4.   Plaintiff also tenders evidence showing

3    that he was given notice of potential misappropriation in 2002

4    by OIS' counsel and nevertheless continued operating it until

5    April 2003, when he sold the business for a significant gain.

6    Based on these facts, plaintiff argues that one may infer that

7    Brodsky had knowledge that misappropriation may have occurred

8    and that he was participating in such misappropriation by

9    funding Eyepictures and by hiring away OIS former employees who

10   misappropriated trade secrets.   Plaintiff has raised a triable

11   issue as to this claim.   Accordingly, defendants' motion as to

12   the fifth cause of action is denied.

13   **D.   SIXTH CAUSE OF ACTION: INTERFERENCE WITH CONTRACT**

14        The elements for an intentional interference with

15   contractual relations claim are: (1) a valid contract between

16   the plaintiff and a third party; (2) the defendant's knowledge

17   of this contract; (3) the defendant's intentional acts designed

18   to induce a breach or disruption of the contractual

19   relationship; (4) actual breach or disruption of the contractual

20   relationship; and (5) resulting damage.   <u>Quelilmane Co., Inc. v.</u>

21   <u>Stewart Title Guaranty Co. et al.</u>, 19 Cal.4th 26, 32 (1998).

22        Defendant Brodsky argues he was unaware of any binding

23   agreements between plaintiff and Eyepictures' employees and that

24   he did not induce anyone to breach such agreements.   Defendant

25   merely cites to his own deposition where he maintains that he

26   never had any personal knowledge that anyone affiliated with

1   Eyepictures was bound by a restrictive employment agreement.  He

2   also states that Mark Fukuhara assured him that no Eyepictures

3   employees were bound by any employment agreements and that he

4   believed Fukuhara.  Brodsky Dep. at 2:15-26.  Plaintiff,

5   however, points out that Mark Fukuhara, a critical employee at

6   Eyepictures, received notice through a letter sent by OIS'

7   counsel stating that "most if not all of the former OIS

8   employees signed valid employment and confidentiality agreements

9   . . . ."  Davis Decl. 1, Ex. D.  As plaintiff notes, a trier of

10  fact could choose to disregard Brodsky's testimony and conclude

11  based on this letter that he had knowledge of OIS' contracts

12  with its former employees and that he nevertheless continued to

13  partake in interfering with such contracts.  In sum, it remains

14  disputed whether Brodsky was unaware of any binding agreements

15  between plaintiff and Eyepictures' employees.  Brodsky's motion

16  as to this cause of action must also be denied.

17       For the reasons stated above, defendants' motions for

18  summary adjudication are DENIED.

19       IT IS SO ORDERED.

20       DATED:  December 16, 2005.

21                              /s/Lawrence K. Karlton
22                              LAWRENCE K. KARLTON
                                SENIOR JUDGE
23                              UNITED STATES DISTRICT COURT

24

25

26